# United States Court of Appeals for the Federal Circuit

AGILENT TECHNOLOGIES, INC.,

*Appellant,*

v.

SYNTHEGO CORPORATION,

*Appellee.*

Appeals from the United States Patent and Trademark Office, Nos. IPR2022-00402 and IPR2022-00403

## BRIEF FOR APPELLEE SYNTHEGO CORPORATION

Max Bloom
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW, Suite 600
Washington, DC 20036
(202) 682-7243
max.bloom@weil.com

Edward R. Reines
Derek C. Walter
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000
edward.reines@weil.com
derek.walter@weil.com

FEBRUARY 16, 2024

*Counsel for Appellee Synthego Corporation*

## REPRESENTATIVE CLAIMS

## U.S. Patent No. 10,337,001 (Claim Nos. 1, 2, and 8)

1.    A synthetic CRISPR guide RNA having at least one 5'-end and at least one 3'-end, the synthetic guide RNA comprising:

(a)    one or more modified nucleotides within five nucleotides from said 5'-end, or

(b)    one or more modified nucleotides within five nucleotides from said 3'-end, or

(c)    both (a) and (b);

wherein said guide RNA comprises one or more RNA molecules, and has gRNA functionality comprising associating with a Cas protein and targeting the gRNA:Cas protein complex to a target polynucleotide, wherein the modified nucleotide has a modification to a phosphodiester linkage, a sugar, or both.

2.    The synthetic guide RNA of claim 1 wherein said guide RNA is a single guide RNA (sgRNA).

8.    The synthetic guide RNA of claim 1 wherein said guide RNA comprises a modified internucleotide linkage or a modified terminal

phosphate group selected from a phosphonocarboxylate, a phosphonoacetate, and a phosphonothioacetate group. Appx286.

## U.S. Patent No. 10,900,034 (Claim Nos. 1, 4, and 6)

1.    A synthetic CRISPR guide RNA comprising:

(a)    a crRNA segment comprising (i) a guide sequence capable of hybridizing to a target sequence in polynucleotide, (ii) a stem sequence; and

(b)    a tracrRNA segment comprising a nucleotide sequence that is partially or completely complementary to the stem sequence,

wherein the synthetic guide RNA has gRNA functionality comprising associating with a Cas protein and targeting the gRNA:Cas protein complex to the target sequence, and comprises one or more modifications in the guide sequence, wherein the one or more modifications comprises a 2'-O-methyl.

4.    The synthetic guide RNA of claim 1 wherein the guide RNA is a single-guide RNA (sgRNA).

6.    The synthetic guide RNA of claim 1, wherein said one or more modifications comprises a 2'-O-methyl nucleotide with a 3'-phosphonoacetate.

Appx439.

# CERTIFICATE OF INTEREST

As required by Federal Circuit Rule 47.4, I certify the following:

1.  Represented Entities. Fed. Cir. R. 47.4(a)(1). Provide the full names of all entities represented by undersigned counsel in this case.

    Synthego Corporation

2.  Real Party in Interest. Fed. Cir. R. 47.4(a)(2). Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

    Not applicable.

3.  Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

    Not applicable.

4.  Legal Representatives. List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

    Not applicable.

5.  Related Cases. Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include

the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

Agilent Technologies, Inc. v. Synthego Corporation, C.A. No. 1:21-cv-01426-RGA (D. Del.)

Agilent Technologies, Inc. v. Synthego Corporation, C.A. No. 3:22-cv-00685-EJD (D. Del.)

Synthego Corporation v. Agilent Technologies, Inc., No. 5:21-cv-07801-EJD (N.D. Cal.)

6. Organizational Victims and Bankruptcy Cases. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

Not applicable.

Respectfully submitted,

Dated: February 16, 2024

/s/ Edward R. Reines

Edward R. Reines
*Principal Attorney*
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Telephone: (650) 802-3000
edward.reines@weil.com

*Counsel for Appellee*

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION .................................................................. 1

STATEMENT OF ISSUES ....................................................... 3

STATEMENT OF THE CASE ................................................... 4

    A. Factual Background .................................................... 4

        1. Synthetic Nucleic Acids And Nucleotide Modifications ........ 4

        2. The CRISPR-Cas System And Pioneer Hi-Bred ................... 9

    B. Agilent's Patents ...................................................... 15

    C. Proceedings Below ..................................................... 18

        1. Synthego's Arguments ............................................. 18

        2. The Board's Institution Decision ................................. 22

        3. Agilent's Response ................................................. 23

        4. The Board's Final Written Decision .............................. 24

SUMMARY OF THE ARGUMENT ............................................. 27

STANDARD OF REVIEW ....................................................... 29

ARGUMENT .................................................................... 30

  I. Substantial Evidence Supports The Board's Finding That Pioneer Hi-Bred Discloses gRNA Functionality ............................. 30

    A. Pioneer Hi-Bred Describes The Modified Nucleotides As Possessing gRNA Functionality ...................................... 31

        1. Agilent's Arguments Are Immaterial To Express Disclosure ......................................................... 37

        2. The Board Correctly Rejected Agilent's Functionality Arguments On The Facts ......................................... 39

    B. The Board Did Not Violate The APA ................................. 43

        1. The Board's Decision Fairly Reflects The Parties' Framing Of The Issues .......................................... 44

      2.   Agilent Had Fair Notice Of The Board's Reasoning ........... 49

II. Pioneer Hi-Bred Is Enabling. ........................................................... 51

    A.  Pioneer Hi-Bred Is Enabling Because A Skilled Artisan Could Make The Functional gRNAs Disclosed In Pioneer Hi-Bred .............................................................................. 52

    B.  A Skilled Artisan Would Not Need Undue Experimentation To Screen For Functionality ...................................................... 56

        1.   As The Board Explained, It Would Not Have Been Difficult To Screen For Functionality ................................... 57

        2.   Agilent Does Not Provide Any Factual Reason Why Screening For Functionality Would Require Undue Experimentation .................................................... 60

        3.   Agilent's Reliance On *Impax* And *Amgen* Is Misplaced ...... 62

    C.  Agilent's Argument On sgRNAs Is Both Immaterial And Wrong ........................................................................... 68

III. The PACE And thioPACE Modifications Are Obvious ................... 71

    A.  A Skilled Artisan Would Understand That PACE And thioPACE Modifications Preserve gRNA Functionality ........... 72

    B.  Substantial Evidence Shows That A Skilled Artisan Would Have Reasonably Expected The PACE And thioPACE Modifications To Be Successful .................................................. 75

CONCLUSION .............................................................................. 79

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alcon Research Ltd. v. Barr Laboratories, Inc.*,
745 F.3d 1180 (Fed. Cir. 2014) ......................................... 38, 39

*Allergan, Inc. v. Sandoz Inc.*,
796 F.3d 1293 (Fed. Cir. 2015) ............................................. 38

*Amgen Inc. v. Sanofi*,
598 U.S. 594 (2023) .................................................... *passim*

*Apple Inc. v. Corephotonics, Ltd.*,
81 F.4th 1353 (Fed. Cir. 2023) ............................................ 44

*Apple Inc. v. Corephotonics, Ltd.*,
861 F. App'x 443 (Fed. Cir. 2021) ........................................ 51

*Arthrex, Inc. v. Smith & Nephew, Inc.*,
935 F.3d 1319 (Fed. Cir. 2019) ....................................... 49, 51

*Biestek v. Berryhill*,
139 S. Ct. 1148 (2019) ................................................... 29

*Blue Calypso, LLC v. Groupon, Inc.*,
815 F.3d 1331 (Fed. Cir. 2016) ........................................... 29

*Cameron Int'l Corp. v. Nitro Fluids, L.L.C.*,
No. 2021-1183, 2022 WL 636099 *6 (Fed. Cir. 2022) .......................... 51

*Continental Paper Bag Co. v. Eastern Paper Bag Co.*,
210 U.S. 405 (1908) ..................................................... 66

*Genzyme Therapeutic Pros. Ltd. v. Biomarin Pharm. Inc.*,
825 F.3d 1360 (Fed. Cir. 2016) ........................................... 50

*HTC Corp. v. Cellular Commc'ns Equip., LLC*,
877 F.3d 1361 (Fed. Cir. 2017) ........................................... 29

*Impax Laboratories v. Aventis Pharmaceuticals, Inc.*,
545 F.3d 1312 (Fed. Cir. 2008) ............................... 62, 63, 64, 65

*In re Antor Media Corp.*,
689 F.3d 1282 (Fed. Cir. 2012) ................................. 26, 37, 66

*In re Magnum Oil Tools Int'l, Ltd.*,
  829 F.3d 1364 (Fed. Cir. 2016) .................................................. 49

*In re Morsa*,
  803 F.3d 1374 (Fed. Cir. 2015) ............................................ 51, 53

*In re NuVasive Inc.*,
  841 F.3d 966 (Fed. Cir 2016) .................................................. 49

*In re Wands*,
  858 F.2d 731 (Fed. Cir. 1988) ........................................ 57, 60, 61

*Kalman v. Kimberly-Clark Corp.*,
  713 F.2d 760 (Fed. Cir. 1983) .................................................. 37

*KSR Int'l Co. v. Teleflex Inc.*,
  550 U.S. 398 (2007) ................................................................ 74

*Laitram, LLC v. Ashworth Bros., Inc.*,
  2023 WL 3449148 (Fed. Cir. May 15, 2023) ......................... 73

*Minnesota Min. & Mfg. Co. v. Chemque, Inc.*,
  303 F.3d 1294 (Fed. Cir. 2002) .............................................. 29

*Novo Nordisk Pharms., Inc. v. Bio-Tech. Gen. Corp.*,
  424 F.3d 1347 (Fed. Cir. 2005) ........................................ 25, 31

*Rasmusson v. SmithKline Beecham Corp.*,
  413 F.3d 1318 (Fed. Cir. 2005) .............................................. 38

*Regents of Univ. of Cal. v. Broad Inst., Inc.*,
  903 F.3d 1286 (Fed. Cir. 2018) .............................................. 30

*SAS Inst. v. ComplementSoft, LLC*,
  825 F.3d 1341 (Fed. Cir. 2016) .............................................. 49

*SAS Inst., Inc. v. Iancu*,
  138 S. Ct. 1348 (2018) ............................................................ 49

**Statutes**

35 U.S.C. § 102 ....................................................................... 18

35 U.S.C. § 103 ....................................................................... 18

35 U.S.C. § 103(a) ................................................................... 74

35 U.S.C. § 112(a) ................................................................... 65

# Rules

Federal Circuit Rule 32(b)(1) ........................................................................ 81

Federal Circuit Rule 32(b)(2) ........................................................................ 81

Federal Circuit Rule 32(b)(3) ........................................................................ 81

Federal Rule of Appellate Procedure 32(a)(5) ........................................... 81

Federal Rule of Appellate Procedure 32(a)(6) ........................................... 81

Federal Rule of Appellate Procedure 32(f) ................................................. 81

Federal Rule of Appellate Procedure 32(g) ................................................ 81

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Appellee Synthego Corporation states that no appeal in or from IPR2022-00402 or IPR2022-00403 in the United States Patent and Trademark Office Patent Trial and Appeal Board ("Board") was previously before this or any other appellate court.

Synthego has filed suit against Appellant Agilent Technologies, Inc. to seek a declaratory judgment for noninfringement of the two patents at issue here, U.S. Patent Nos. 10,337,001 and 10,900,034, in *Synthego Corp. v. Agilent Techs., Inc.*, No. 21-cv-07801 (N.D. Cal.). Agilent filed a counterclaim for infringement of the '001 and '034 patents. The action has been stayed pending resolution of the Board proceedings at issue in this appeal.

Agilent has also asserted the '001 and '034 patents against Synthego in *Agilent Techs., Inc. v. Synthego Corp.*, No. 21-cv-01426 (D. Del.). The case was transferred to the United States District Court for the Northern District of California as *Agilent Techs., Inc. v. Synthego Corp.*, No. 22-cv-00685 (N.D. Cal.), and was subsequently closed upon consolidation with case No. 21-cv-07801.

# INTRODUCTION

The CRISPR-Cas system revolutionized the field of gene editing when it was discovered in 2012. But the patents at issue here are not directed to that foundational discovery. Instead, Agilent's patents are directed to routine chemical modifications that had been known for decades to enhance the stability of the RNA molecules that can be used with CRISPR (and other systems).

Unsurprisingly, almost immediately after the CRISPR-Cas system was discovered, numerous inventors and scientists proposed using these standard modifications with CRISPR. After all, as Agilent's own expert testified, the modifications were well understood in the field and a skilled artisan would have understood they could be applied to CRISPR. Yet Agilent nevertheless sought a monopoly over these routine modifications to attempt to exploit the burgeoning CRISPR field.

As Synthego explained in the proceedings below, the prior art Pioneer Hi-Bred reference had already disclosed the exact chemical modifications to gRNA sequences that Agilent attempted to patent in most of its claims. While a few modifications referenced in Agilent's patents are not disclosed by Pioneer Hi-Bred, these were also standard modifications

that had been known for years. Accordingly, as the Board rightly found, each claim in Agilent's patents is unpatentable.

On appeal, Agilent suggests that the Board's fact-bound decision should be set aside because the chemically modified sequences disclosed in Pioneer Hi-Bred supposedly were not functional and because it would supposedly be difficult for a skilled artisan to screen for functionality. But Pioneer Hi-Bred described these sequences as functional, and the Board found that a skilled artisan would have had little difficulty creating functional modified gRNA based on Pioneer Hi-Bred's teachings. Overwhelming evidence from Agilent's own patents, witnesses, and internal development work makes the Board's conclusions to this effect inescapable. And this Court reviews these factual determinations by the Board for substantial evidence, a deferential standard that Agilent makes no serious effort to overcome.

As the Board explained, Agilent's arguments on functionality misunderstood the testing data in Pioneer Hi-Bred and were contradicted by the evidence. Rather than point to data that concerned the **RNA** embodiments that Synthego relied upon, Agilent pointed to data for **DNA** sequences, and that proved nothing about functionality. Accordingly,

Agilent had failed to present any affirmative evidence that the sequences actually at issue were non-functional. Again, these were factual determinations that the Board made after considering the evidence and testimony from both parties. Agilent provides no sound explanation why these determinations were not supported by substantial evidence.

Agilent's remaining arguments to try to side-step the factual nature of the Board's decision, including those regarding notice of the basis for the Board's decision, fare no better as explained below.

## STATEMENT OF ISSUES

1. Whether substantial evidence supports the Board's finding that Pioneer Hi-Bred discloses gRNA functionality.

2. Whether the Board decided invalidity on grounds for which Agilent was not given notice.

3. Whether Pioneer Hi-Bred is enabling.

4. Whether the PACE and thioPACE modifications in Agilent's patents were obvious.

# STATEMENT OF THE CASE

## A.  Factual Background

### 1.  Synthetic Nucleic Acids And Nucleotide Modifications

For decades, scientists have understood that synthetic nucleic acids may be created in laboratories to control gene expression. As early as 1978, for instance, two molecular biologists, Paul Zamecnik and Mary Stephenson, showed that a synthetic DNA oligonucleotide—a short nucleic acid molecule—could be introduced into cells to "silence" a gene by disabling the messenger RNA associated with that gene. *See* Appx2737.

In the early 2000s, scientists extended this by showing that synthetic RNA could be used to create small interfering RNA, or siRNA, which inhibit the expression of genes by degrading the messenger RNA after transcription. *See* Appx2740. And at around the same time, scientists discovered micro-RNA, or miRNA, RNA sequences that play an important role in gene expression by inhibiting messenger RNA translation. *See* Appx2412. In turn, scientists developed reverse targeting miRNA, known as antagomirs or anti-miRNA, synthetic RNA molecules that can target and silence miRNAs associated with disease. *See* Appx2412; Appx3895.

Critically, for almost as long as these classes of synthetic nucleic acids have existed, it has been well understood that they were vulnerable to degradation and instability, potentially rendering them ineffective for therapeutic use. *See* Appx2412; Appx2737. In particular, enzymes in the cell known as nucleases cleave the bonds holding the nucleic acid strand together, thereby degrading the molecule and rendering it ineffective. *See* Appx4990. Endonucleases cleave the bonds in the interior of the sequence, Appx2420; Appx4990, while exonucleases cleave nucleotides sequentially from the ends, *see* Appx2420; Appx4998.

Accordingly, beginning in the 1970s, scientists modified the chemical structure of these synthetic molecules to make them resistant to degradation. Zamecnik and Stephenson did just this in their 1978 article by chemically blocking the oligonucleotides at their 5' and 3' ends. *See* Appx2411. Such modifications were subsequently introduced to improve the functioning of synthetic siRNA and synthetic antagomirs, as well as of second-generation antisense oligonucleotides extending the work of Zamecnik and Stephenson. *See* Appx2414–2416. As Agilent's own expert testified, by the mid-1980s it was "well understood in the art that chemical modifications to RNA could be used to stabilize the RNA against

nucleases." Appx4465. Agilent's own expert made numerous admissions confirming just how well-known and understood these various modifications were. *See* Appx1134–1150.

These modifications often shared certain properties. For instance, it is advantageous to modify nucleotides near the ends of an RNA strand (known as the 3' or 5' ends), because exonucleases progressively attack RNAs from the end of the nucleotide chain. *See* Appx2420; Appx4903 (Agilent's expert agreeing that modifications at the terminal end were well known by 2014). And particularly common modifications included altering the phosphate group through phosphorothioate modifications, and altering the ribose sugar in the individual nucleotide through 2'-O-methyl modifications. *See* Appx2417–2420. These modifications can work together: modifying the 5' or 3' ends of a RNA prevents an exonuclease from attacking the RNA sequence at the termini, while placing an O-methyl modification at the adjacent 2' position prevents an endonuclease from removing the modified nucleotide. Appx2420.

Indeed, Agilent's expert explained that the combination of a phosphorothioate and a 2'-O-methyl had been explored since "the late '80s to '90s." Appx4472. By the early 2010s, a "vast array" of modifications

were known that "balance[d] prevention of RNA degradation with preservation of the RNA's function." Appx2413. For instance, one review article, referred to in these proceedings as the prior art reference Deleavey, surveyed the field and disclosed an array of modifications to the phosphodiester bonds that would "improve[] nuclease resistance." Appx2743.

These modifications included the phosphorothioate modification discussed above, which entails substituting an oxygen in the phosphate group with a sulfur atom, thereby "impart[ing] significant resistance to nuclease degradation." Appx2743. Deleavey further explained that this modification is "cost-effective" and "readily incorporated," and hence has become "widely used." Appx2743. Deleavey also discussed substituting an oxygen with an acetic acid group, also leading to "enhanced nuclease resistance," in what is known as a phosphonoacetate (PACE) modification. Appx2744. Both modifications, among others, are shown in the following chart from Deleavey, with phosphorothioate listed first:

Appx2743.



Phosphodiester    Phosphorothioate (PS)    N3′ Phosphoramidate (NP)    Boranophosphate    2′,5′-Phosphodiester

Amide-linked    Phosphonoacetate (PACE)    Morpholino    Peptide Nucleic Acid (PNA)

Deleavey also discussed modifications to the ribose sugar that improve resistance to nucleases. The article noted that 2'-O-methylation, which involves replacing the hydroxyl at the 2' carbon of the ribose with a methyl group, is "one of the most widely used modifications" because it "increase[d] nuclease stability" and is well tolerated in various uses of synthetic RNA. Appx2744. As with the phosphate modifications, Deleavey included a chart showing the various sugar modifications that were common at the time. 2'-O-methylation is listed first (after the unmodified RNA and DNA sugars), reflecting its pride of place among the well-known sugar modifications:

Appx2746.

### 2. The CRISPR-Cas System And Pioneer Hi-Bred

In 2012, Emmanuelle Charpentier and Jennifer A. Doudna revolutionized genetic engineering by showing that the "CRISPR-Cas system" could be used to precisely edit the genome. *See* Appx2400. The CRISPR-Cas system combines a synthetic guide RNA, or gRNA, with a CRISPR-associating protein, or Cas protein (generally Cas9). Appx2400.

The gRNA can be designed as either a duplex of two different molecules—one that is designed to target a specific DNA sequence, and one that is designed to anneal with the Cas9 protein—or as a single molecule, with the two components fused together in what is known as

sgRNA.  *See* Appx2401–2402.  The gRNA and the Cas9 bind to form a single complex, the gRNA directs the complex to a targeted DNA sequence, and the Cas9 protein cleaves the DNA sequence at that location, allowing the existing genes to be removed or new ones added to the sequence. Appx2402.  In this way, the CRISPR-Cas system acts as a very precise set of "genetic scissors."  In 2020, Charpentier and Doudna won the Nobel Prize for this discovery.

Almost immediately after the CRISPR-Cas system was developed, researchers began applying the nucleotide modifications that had been used to control degradation in other systems to the CRISPR-Cas system. *See* Appx2418.  This is unsurprising:  as Agilent's own expert acknowledged, researchers recognized from the moment of Charpentier and Doudna's discovery that "this degradation issue…would also arise in the context of CRISPR-Cas9." Appx4839.  Agilent's expert likewise agreed that "[m]ultiple researchers rapidly suggested using chemically modified guide RNAs with CRISPR very quickly after the Doudna team published their work."  Appx4805.  Agilent agreed that "it was known that certain chemical modifications can make RNA more resistant to nuclease degradation."  Appx977; *see also* Appx1136–1138; Appx1202–1205.

Furthermore, as Synthego's expert explained, "a person of ordinary skill in 2014 would similarly have…understood that chemical modifications at the 5' and/or 3' ends of guide RNAs in CRISPR-Cas applications would have preserved the Cas enzyme's gene editing function." Appx2423. Indeed, it was quickly shown that Cas9 easily tolerated mutations while maintaining functionality. Appx2423–2424. By the end of 2014, multiple references disclosed modifying gRNAs with 2'-O-methyl or phosphorothioate modifications. Appx2418–2420.

One such reference was "Pioneer Hi-Bred," an international patent application filed on August 20, 2014. *See* Appx2588. Pioneer Hi-Bred describes certain "[c]ompositions and methods" that "employ a guide polynucleotide/Cas endonuclease system to provide an effective system for modifying or altering target sites within the genome of a cell or organism." Appx2588. The term "guide polynucleotide" is defined in Pioneer HiBred as "a polynucleotide sequence that can form a complex with a Cas endonuclease and enables the Cas endonuclease to recognize and optionally cleave a DNA target site." Appx2613. Pioneer Hi-Bred further explains that the "guide polynucleotide sequence can be a single or double molecule." Appx2613. Pioneer Hi-Bred goes on to discuss various methods

for employing the CRISPR-Cas system to edit genes. *See, e.g.*, Appx2696; Appx2700-2701.

In connection with this, Pioneer Hi-Bred teaches using nucleotide modifications to increase the stability of the guide polynucleotides, explaining that such modifications offered "resistance to cellular degradation." Appx2616. Pioneer Hi-Bred described these methods in Example 4 of the patent application, which disclosed "[m]odifying nucleic acid component(s) of the guide polynucleotide/Cas endonuclease system to increase cleavage activity and specificity." Appx2693.

In Example 4, Pioneer Hi-Bred specifically discussed how the nucleotides could be altered "to decrease unwanted nuclease degradation," and provided a table (Table 7) of such modifications. Appx2696. Reflecting the well-understood role of 2'-O-methyl and phosphorothioate modifications in reducing degradation, Pioneer Hi-Bred included both of these alterations in the table, and explained how they could make the guide polynucleotide more resistant to nucleases:

Table 7. Nucleotide base and phosphodiester bond modifications to decrease unwanted nuclease degradation.

| Modification | Effect |
|---|---|
| Deoxyribonucleic Acid | Less susceptible to nuclease degradation than RNA[1] |
| Locked Nucleic Acid | Very resistant to nuclease cleavage[2] |
| 2'-Fluoro A or U | Increased resistance to nuclease cleavage[3] |
| 2'-O-Methyl RNA Bases | Resistant to ribonucleases and 5-10 fold more resistant to DNases than DNA[4] |
| Phosphorothioate bond | Very resistant to nuclease cleavage[5] |

Appx492 (annotated table in Synthego's petition).

In a subsequent table, Pioneer Hi-Bred listed several examples of modified sequences, including sequences containing a 2'-O-methyl modification (marked with an "m") or a phosphorothioate modification (marked with an asterisk) near the 3'-end or 5'-end:

Table 8. crRNA and crDNA nucleotide base and phosphodiester linkage modifications.

| Nucleic Acid Type | Modification | crRNA or crDNA Sequence and Corresponding Modification[1] | |
|---|---|---|---|
| | | VT Domain | CER Domain |
| crRNA | None | GCGUACGCGUACGUGUG (SEQ ID NO: 62) | GUUUUAGAGCUAUGCUGUUUUG (SEQ ID NO: 63) |
| crRNA | Phosphorothioate bonds near ends | G*C*G*UACGCGUACGUGUG (SEQ ID NO: 64) | GUUUUAGAGCUAUGCUGUU*U*U*G (SEQ ID NO: 65) |
| crRNA | 2'-O-Methyl RNA nucleotides at ends | mGmCmGUACGCGUACGUGUG (SEQ ID NO: 66) | GUUUUAGAGCUAUGCUGUUmUmUmG (SEQ ID NO: 67) |
| crRNA | 2'-O-Methyl RNA nucleotides for each nucleotide | mGmCmGmUmAmCmGmCmG mUmAmCmGmUmGmUmG (SEQ ID NO: 68) | mGmUmUmUmUmAmGmAmGmC mUmAmUmGmCmUmGmUmUmU mUmG (SEQ ID NO: 69) |

Appx2430 (annotated table); *see also* Appx2698 (unannotated table in Pioneer Hi-Bred). Pioneer Hi-Bred further explained that "[n]ucleotide base and/or phosphodiester bond modifications similar to those illustrated in [Table 8] can be introduced individually or in combination" into the CRISPR-Cas system. *See* Appx2702.

In short, Pioneer Hi-Bred provides a targeted and detailed description identifying not just the specific chemical modifications that should be used with CRISPR guide RNAs, but also the particular locations where they ought to be used and the rationale for why the modifications will work.

## B. Agilent's Patents

Undeniably aware of the extensive prior art related to the use of chemically modified RNAs, *see* Appx4475–4498, a group of Agilent scientists, just like numerous other researchers, proposed to use such modified RNAs with CRISPR shortly after Doudna and Charpentier published their CRISPR discovery. Agilent then confirmed that the numerous tried-and-true modifications that had worked in other systems would work in CRSPR as well.

Specifically, Agilent scientists synthesized and tested roughly 250 different gRNAs. *See* Appx8488. Because both the modifications and the procedures for synthesizing RNA were well understood at the time, the entire process—from first identifying the most promising modifications to synthesizing, validating, and testing them, for over 250 distinct molecules—took only a year. *See* Appx4617. And because the modifications predictably preserved the functionality of the gRNA, as the prior art had understood, 97% of the sequences tested by Agilent were successful for their intended purpose. *See* Appx28.

Despite there being nothing inventive in this confirmatory work, Agilent then sought to patent practically the entire field of modified gRNA.

Two patents are at issue here: U.S. Patent No. 10,337,001 (the '001 patent) and U.S. Patent No. 10,900,034 (the '034 patent). *See* Appx144; Appx288.

Both patents broadly encompass well-understood nucleotide modifications to synthetic gRNA molecules, plus, as Synthego's expert confirmed, a slew of exotic additional modifications that Agilent never tested. *See* Appx4738–4739; Appx4768–4773. The patents do not purport to invent the gRNA themselves, i.e., the discovery that earned the Nobel Prize. Nor do they reflect advances in synthesizing gRNA. Instead, notwithstanding that nucleotide modifications had been broadly applied to synthetic RNA, and that prior references had specifically discussed applying these modifications to gRNA, the specifications allege that the claims are "based…on an unexpected discovery that certain chemical modifications to gRNA are tolerated by the CRISPR-Cas system." Appx166 at 3:34–36; Appx312 at 3:51–53.

The claims themselves, however, recite little more than familiar nucleotide modifications—particularly 2'-O-methyl and phosphorothioate modifications—at the ends of the nucleotide sequence. Claim 1 of the '001 patent is representative for purposes of the appeal:

1. A synthetic CRISPR guide RNA having at least one 5'-end and at least one 3'-end, the synthetic guide RNA comprising:

(a) one or more modified nucleotides within five nucleotides from said 5'-end, or
(b) one or more modified nucleotides within five nucleotides from said 3'-end, or
(c) both (a) and (b);

wherein said guide RNA comprises one or more RNA molecules, and has gRNA functionality comprising associating with a Cas protein and targeting the gRNA:Cas protein complex to a target polynucleotide, wherein the modified nucleotide has a modification to a phosphodiester linkage, a sugar, or both.

Appx286 at 243:10–24. Claim 1 applies to any gRNA that is functional in the sense that it can "associate[e] with a Cas protein" and then "target[] … a target polynucleotide," and where a nucleotide near either the 5'-end or the 3'-end of the strand contains *any* modification to a phosphodiester linkage or a sugar.

The dependent claims tack on nothing more than standard modifications that had long been used in the art, such as 2'-O-methyl, phophorothioate, phosphonocarboxylate, phosphonoacetate, and phosphonothioacetate. *See* Appx286 at 243:25–26, 243:60–64; Appx439 at 257:59–60.

## C.    Proceedings Below

On January 4, 2022, Synthego filed two IPR petitions, one challenging all claims in the '001 patent, *see* IPR2022-00402 (Appx448), and one challenging all claims in the '034 patent, *see* IPR2022-00403 (Appx9106).

### 1.    Synthego's Arguments

As to most claims in both patents, Synthego argued anticipation by Pioneer Hi-Bred.  *See* 35 U.S.C. § 102.  As to the remaining claims, Synthego argued obviousness based on Pioneer Hi-Bred with two other prior art references, Deleavey and Threlfall.  *See* 35 U.S.C. § 103.

**1.**    Pioneer Hi-Bred explains that functional gRNA can be modified by employing 2'-O-methyl or phosphorothioate modifications near the 3'-end or the 5'-end of the nucleotide sequence.  For these reasons, Synthego explained that claims  1–7, 9–10, 12–15, 17–18, 20–25, and 27–30 of the '001 patent and claims 1–5, 8–21, and 24–33 of the '034 patent were anticipated by Pioneer Hi-Bred—including all of the independent claims in both patents.  *See* Appx481; Appx9141.

As Synthego established, Pioneer Hi-Bred discloses gRNA that have the functionality described in Agilent's patents.  Pioneer Hi-Bred references polynucleotides that can "form a complex with a Cas

endonuclease" and "enable[] the Cas endonuclease to recognize and optionally cleave a DNA target site," Appx481 (quoting Appx2613); *see also* Appx488–490. These polynucleotides thereby meet the two requirements for functionality described in Agilent's patents—associating with a Cas protein and targeting the gRNA:Cas complex to a target sequence. Critically, this functionality does not require that the target gene actually be edited. Pioneer Hi-Bred further explains that the "guide polynucleotide sequence can be a single or double molecule." Appx481–482 (quoting Appx2613).

Next, as discussed above, Pioneer Hi-Bred discloses that the polynucleotides may be modified to resist degradation by nucleases. Specifically, Table 7 of Pioneer Hi-Bred discloses the 2'-O-methyl and phosphorothioate modifications recited in some of the claims of Agilent's patents. *See* Appx491 (quoting Appx2616). And Table 8 lists sequences containing a 2'-O-methyl or a phosphorothioate modification within five nucleotides from the 3'-end and 5'-end of the gRNAs, as set forth by some of Agilent's claims. *See* Appx485–486. Pioneer Hi-Bred further explains that "[n]ucleotide base and/or phosphodiester bond modifications similar to those illustrated in [Table 8] can be introduced individually or in

combination" into the CRISPR-Cas system, i.e., there may be a modification to a phosphodiester bond, a sugar, or both. *See* Appx495 (quoting Appx2702).

Finally, as Synthego explained, Pioneer Hi-Bred repeatedly describes the modified gRNA as retaining "gRNA functionality to edit cells." Appx490. Synthego noted that, "[f]or example," Pioneer Hi-Bred "discloses that the modified gRNAs of Table 8 and Table 7 can be used to edit cells such as maize cells." Appx490.

**2.** While most of the claims in the '001 and '034 patents specifically reference either 2'-O-methyl or phosphorothioate modifications, some dependent claims recite two modifications to the phosphate group not disclosed by Pioneer Hi-Bred: phosphonoacetate (PACE) modifications and thiophosphonoacetate (thioPACE) modifications. Synthego argued that these claims were rendered obvious by the combination of Pioneer Hi-Bred with either Threlfall or Deleavey. *See* Appx528; Appx9191.

Threlfall is a scientific article published in November 2011 in the journal *Organic & Biomolecular Chemistry*. *See* Appx478–479. Threlfall explains that PACE and thioPACE modifications can be made at or near

the 3' and 5' ends of RNA strands, and that doing so increases the resistance of the RNA strands to nucleases. *See* Appx529 (citing Appx2773). Similarly, Deleavey is a scientific article published in the journal *Chemistry & Biology Review* in August 2012. Appx478. Deleavey also discloses modified RNAs with PACE and thioPACE modifications near the 3' and 5' ends and explains that these modifications were well tolerated in siRNA constructs and helped stabilize the synthetic RNA. *See* Appx531 (citing Appx2743–2744).

Synthego argued that a skilled artisan familiar with Pioneer Hi-Bred would have been motivated to use the PACE and thioPACE modifications described in Threlfall or Deleavey because such modifications "provide the same benefits to gRNAs that Pioneer Hi-Bred seeks to achieve." Appx531. After all, Pioneer Hi-Bred identifies resistance to degradation from nucleases as one of the desired benefits of the nucleotide modifications, and a skilled artisan would be motivated to consider other known modifications with these benefits—which is precisely what Threlfall and Deleavey teach with respect to the PACE and thioPACE modifications. Appx531–532.

Furthermore, a skilled artisan would have a reasonable expectation of successfully combining and synthesizing the gRNAs of Pioneer Hi-Bred with these modifications, because RNAs including such modifications had previously been synthesized in Threlfall. Appx532. Indeed, Threlfall includes synthesis protocols, *see* Appx2779, and those synthesis methods were commercially available prior to Agilent's patents, *see* Appx532–533.

### 2. The Board's Institution Decision

On May 31, 2022, the Board instituted review on both patents. Appx674; Appx9334. As to anticipation, the Board found that Pioneer Hi-Bred disclosed gRNA functionality for the modified molecules because there was "a sufficient connection between the modified crRNA molecules in Table 8 and the disclosure of guide RNA functionality throughout Pioneer Hi-Bred." Appx698. The Board also found these disclosures presumptively enabling and rejected the notion that test data confirming functionality is necessary for Pioneer Hi-Bred to be enabling prior art. Appx700–701.

As to obviousness, the Board found that Synthego had met its burden to show a skilled artisan would have been motivated to combine

the references and would have a reasonable expectation of success in doing so.  Appx702.

### 3.    Agilent's Response

Following institution, Agilent argued the patents were not anticipated by Pioneer Hi-Bred for two primary reasons.

First, Agilent argued Pioneer Hi-Bred did not expressly disclose gRNA functionality for the modified molecules.  But Agilent did not contest that Pioneer Hi-Bred's description of the modified molecules was connected to the disclosure of gRNA functionality in Pioneer Hi-Bred. Instead, Agilent argued Pioneer Hi-Bred couldn't expressly disclose gRNA functionality because, absent actual test results showing functionality for the modified gRNA sequences, the sequences disclosed in Pioneer Hi-Bred were "simply an invitation to experiment."  Appx786.

Second, Agilent argued that Pioneer Hi-Bred was not enabled because it failed to teach skilled artisans "how to make functional sequences without undue experimentation."  Appx791.  Agilent argued Pioneer Hi-Bred disclosed a "laundry list of chemical modifications" and, absent test data or other explicit instructions, a skilled artisan would not know how to enable these modifications.  *See* Appx792–794.

As to obviousness, Agilent presented two main arguments. First, Agilent summarily argued that Synthego's arguments fail because they rely on Pioneer Hi-Bred's disclosure of gRNA functionality. Appx798–799. Accordingly, if the Board concluded gRNA functionality was not disclosed, "then Petitioner's obviousness grounds fail as well." Appx799. Second, Agilent argued that a skilled artisan would not have any reasonable expectation of success combining Pioneer Hi-Bred with the PACE and thioPACE modifications disclosed in Threlfall and Deleavey. *See* Appx807.

### 4. The Board's Final Written Decision

After reply and sur-reply briefing, the Board issued its final written decisions on May 17, 2023, concluding that every claim in both the '001 and '034 patents is unpatentable. *See* Appx1–2; Appx68–69. The Board first found that Pioneer Hi-Bred discloses gRNA functionality because Pioneer Hi-Bred explains that the "guide polynucleotides" discussed therein could associate with a Cas protein and recognize a DNA target site. Appx18. Pioneer Hi-Bred also repeatedly discloses that the modified sequences have this functionality, including by using the term "modified guide polynucleotide" to refer to those sequences, and through explicit

statements that the modified sequences could bind and target DNA sequences. Appx18.

The Board rejected Agilent's argument that Pioneer Hi-Bred did not disclose gRNA functionality because Pioneer Hi-Bred did not include testing data. *See* Appx19. The Board explained that, under this Court's precedents, "anticipation does not require actual performance of suggestions in a disclosure." Appx21 (quoting *Novo Nordisk Pharms., Inc. v. Bio-Tech. Gen. Corp.*, 424 F.3d 1347, 1355 (Fed. Cir. 2005)). Because Pioneer Hi-Bred had expressly disclosed functional gRNA, there was "no additional requirement that this express disclosure be backed by test data in order for the reference to be anticipatory." Appx22.

The Board further explained that Agilent's reliance on the cleavage data from Pioneer Hi-Bred was mistaken. The Board recognized that the data merely showed that cleavage did not occur and yet cleavage is not required for gRNA functionality as defined in Agilent's patents. *See* Appx25. Moreover, the evidence showed that a gRNA lacking cleavage activity may still have the ability to bind a Cas protein and target a polynucleotide. Appx25–26.

Similarly, the Board rejected Agilent's argument that Pioneer Hi-Bred was not enabled. The Board explained that prior art disclosures are presumed enabling, *see In re Antor Media Corp.*, 689 F.3d 1282, 1287–88 (Fed. Cir. 2012), and found that a skilled artisan in December 2014 could practice the disclosures in Pioneer Hi-Bred without undue experimentation. *See* Appx29. Pioneer Hi-Bred taught that the modified gRNAs could be "synthesized per standard techniques," and the Board soundly made a factual finding that the record supported this conclusion. Appx29–30 (quoting Appx2702).

The Board also rejected—as a factual matter—Agilent's argument that its inventors were uniquely skilled in synthesizing RNA and that it would have been extremely challenging for a skilled artisan to perform the synthesis. Appx30. The Board noted that the Agilent patent specifications themselves do not disclose new techniques for synthesizing RNA nor do they disclose particular challenges that need to be overcome, and that Agilent's witness was not credible on this issue. Appx30–31.

The Board also rejected Agilent's argument that the lack of testing data meant that the sequences disclosed in Table 8 of Pioneer Hi-Bred were not enabling. Appx31. Substantial research had been published by

2014, and the chemical modifications disclosed in Pioneer Hi-Bred had been known and used for decades in related systems to stabilize synthetic RNA against degradation. Appx32.

Finally, the Board agreed with Synthego that a skilled artisan would have had a reasonable expectation of success in combining Pioneer Hi-Bred with Threlfall or Deleavey to employ PACE and thioPACE modifications. By December 2014, several studies had shown that the CRISPR-Cas system would work with the modifications at issue, reinforcing testimony from Synthego's expert that a skilled artisan would have expected that such modifications would preserve the gRNA functionality. Appx48–49; Appx60.

## SUMMARY OF THE ARGUMENT

Pioneer Hi-Bred anticipates most of Agilent's claims, because it discloses the exact modifications claimed and explains that the disclosed modified gRNA molecules possess the same functionality as the unmodified gRNA molecules, while the modifications confer resistance to degradation by nucleases. Indeed, Pioneer Hi-Bred teaches that the modifications *improve* functionality. Under this Court's precedents—and as a matter of plain language and common sense—this means that

Pioneer Hi-Bred expressly discloses functional modified gRNA.

Agilent's attempt to create an additional test-data requirement to prove anticipation fails legally and factually. And while Agilent suggests that the Board supposedly violated the Administrative Procedure Act because it did not have notice of the grounds for the Board's decision, this is simply wrong. Agilent was put on notice not only by Synthego's initial petition but also by the Board's decision instituting review.

Agilent's enablement argument also fails. As the Board found, the anticipating embodiments in Pioneer Hi-Bred could have been easily synthesized using standard methods. And even if a few of the disclosed gRNAs in Pioneer Hi-Bred might be non-functional for particular purposes, it would not be difficult for a skilled artisan to screen for functionality—as evidenced by the fact that Agilent itself achieved a 97% success rate with its own tested sequences. Appx57. These conclusions are factual findings by the Board that are entitled to deference.

Finally, the Board made factual findings that a skilled artisan could expect success by combining the modified gRNA in Pioneer Hi-Bred with the specific modifications disclosed in Threlfall and Deleavey. On appeal, Agilent has provided no sound basis for overturning these findings.

# STANDARD OF REVIEW

"Anticipation is a question of fact" that this Court "review[s] for substantial evidence." *Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331, 1341 (Fed. Cir. 2016). Substantial evidence is "more than a mere scintilla" and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

"Whether a prior art reference is enabling is a question of law based upon underlying factual findings." *Minnesota Min. & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1301 (Fed. Cir. 2002). Hence, the Board's underlying factual findings on enablement are entitled to substantial evidence review, while this Court reviews the Board's ultimate conclusion de novo. Similarly, while the Board's ultimate determination on obviousness is a legal one, subject to de novo review, the Board's subsidiary factual findings are reviewed for substantial evidence. *See HTC Corp. v. Cellular Commc'ns Equip., LLC*, 877 F.3d 1361, 1369 (Fed. Cir. 2017). In particular, the Board's finding that a skilled artisan would have had a reasonable expectation of success is subject to substantial evidence review. *Regents of Univ. of Cal. v. Broad Inst., Inc.*, 903 F.3d 1286, 1291 (Fed. Cir.

2018).

## ARGUMENT

## I. Substantial Evidence Supports The Board's Finding That Pioneer Hi-Bred Discloses gRNA Functionality

Pioneer Hi-Bred repeatedly and expressly states that the disclosed modified gRNA can bind with Cas proteins and target a desired DNA sequence, i.e., that they are functional as the term is defined in Agilent's patents. It necessarily follows that Pioneer Hi-Bred discloses gRNA functionality for the modified molecules.

Agilent never seriously contested before the Board that Pioneer Hi-Bred characterizes the modified gRNA as functional. Instead, Agilent argued that Pioneer Hi-Bred had failed to disclose this element because it supposedly was unclear, as a factual matter, whether the examples in Pioneer Hi-Bred actually would work.

But as the Board explained, this is immaterial to whether Pioneer Hi-Bred *discloses* gRNA functionality for the purposes of anticipation. Pioneer Hi-Bred states that its disclosed gRNAs would in fact offer the requisite functionality, and this is enough.

Agilent's arguments that a skilled artisan would supposedly be skeptical of whether Pioneer Hi-Bred's gRNAs would work for their

intended purpose, if anything, go to enablement. But the enablement analysis for the purposes of anticipation simply asks whether the prior art reference "include[s] information sufficient to enable the invention to be put to practical use." Appx57. Notably, Agilent did not bring its arguments to this effect under the enablement heading—likely because of this Court's many opinions explaining that enablement does not require test data or working examples.

This Court's precedents have explained time and time again, "anticipation does not require actual performance of suggestions in a disclosure." *Novo Nordisk Pharms.,* 424 F.3d at 1355 . Agilent's contrary position would work a radical departure from that precedent; indeed, in 12 pages of briefing, Agilent does not cite ***any*** case affirmatively supporting its reading of anticipation law. *See* Opening Br. 27–39.

## A. Pioneer Hi-Bred Describes The Modified Nucleotides As Possessing gRNA Functionality

As the Board correctly found, *see* Appx18; Appx22–24, Pioneer Hi-Bred repeatedly describes its modified nucleotides as possessing the functionality claimed in Agilent's patents—i.e., "associating with a Cas protein and targeting the gRNA:Cas protein complex to a target polynucleotide." Appx286 at 243:21–22; Appx439 at 257:43–44. The

evidence to this effect in Pioneer Hi-Bred not only exceeds a scintilla, but is overwhelming. *See, e.g.*, Appx1086–1095; Appx1421–1422.

According to Agilent, "Synthego did not point to any functionality other than editing." Opening Br. 20. This is flat wrong. Synthego did indeed point to editing, but it also pointed to much more.

As Synthego explained in its petition, *see* Appx481–482; Appx489, Pioneer Hi-Bred defines the gRNA at issue here (defined as "guide polynucleotides" in Pioneer Hi-Bred), as being able to "form a complex with a Cas endonuclease and enable[] the Cas endonuclease to recognize and optionally cleave a DNA target site," Appx2613. In addition to citing this definition in its Petition, Synthego raised it again during the oral hearing. *See* Appx489 (citing Appx2613 at 24:6-8); Appx1089; Appx1421.

 Synthego likewise noted in its Petition and during the oral hearing that Pioneer Hi-Bred specifically teaches that its guide RNAs include a region that targets a "specific DNA sequence" and region that "interacts with a Cas endonuclease." Appx488–489; *see also* Appx489 ("Pioneer Hi-Bred teaches that the gRNA-Cas9 endonuclease complex enables Cas9 to ***recognize*** and cleave a target polynucleotide such as DNA.")[1]; Appx489–

---

[1] Emphases are added throughout unless otherwise noted.

490 ("This functionality extends to sgRNA, which is 'a fusion between a crRNA and a tracrRNA' possessing a VT domain that is complementary to a nucleotide sequence in a target DNA and a CER domain that *interacts with* a Cas9 endonuclease.").

Synthego's Petition further showed the figures from Pioneer Hi-Bred depicting guide RNAs as binding to the Cas protein and recognizing a target site:



Appx1088; *see also* Appx1087; Appx1421; Appx488–489. This binding and recognition of a target sequence is, in fact, what the claims themselves identify as being within the scope of "gRNA functionality." *See* Appx286; Appx439; *see also* Appx924–925. While the foregoing is more than enough,

Agilent acknowledges that Synthego further explained that Pioneer Hi-Bred teaches that the "CRISPR RNA polynucleotide duplex functions to guide and to target site cleavage." Appx1421; Appx1090; Appx489. This constitutes substantial evidence.

Yet, beyond this, Pioneer Hi-Bred likewise teaches that the **modified** guide RNAs it discloses also have precisely the foregoing functionality. In fact, as Synthego noted, Pioneer Hi-Bred teaches in Example 4 and Table 7 that "modifying" the nucleic acid components will "**increase** cleavage activity and specificity:"



**Pioneer Hi-Bred Discloses "gRNA Functionality:"**
**Increasing Cleavage Activity And Specificity**

EXAMPLE 4
Modifying nucleic acid component(s) of the guide polynucleotide/Cas endonuclease system to increase cleavage activity and specificity.

Table 7. Nucleotide base and phosphodiester bond modifications to decrease unwanted nuclease degradation.

| Modification | Effect |
| --- | --- |
| Deoxyribonucleic Acid | Less susceptible to nuclease degradation than RNA[1] |
| Locked Nucleic Acid | Very resistant to nuclease cleavage[2] |
| 2'-Fluoro A or U | Increased resistance to nuclease cleavage[3] |
| 2'-O-Methyl RNA Bases | Resistant to ribonucleases and 5-10 fold more resistant to DNases than DNA[4] |
| Phosphorothioate bond | Very resistant to nuclease cleavage[5] |

Ex. 1006 (Pioneer Hi-Bred) at Table 7 ['001 Petition at 26]

DEMONSTRATIVE EXHIBIT – NOT EVIDENCE                    Synthego 38

Appx1091; *see also* Appx1421; Appx490; Appx2449; Appx2462–2463.

As the Board correctly noted in its final written decision, Pioneer Hi-Bred repeatedly discloses that the modified guide RNAs have such functionality. *See* Appx18. Specifically, at Appx18, the Board cited multiple statements at page 107 of Pioneer Hi-Bred. *See* Appx2696 ("modified guide nucleotides" "may be co-delivered" with the "remaining components of the guide polynucleotide/Cas endonuclease system needed to form a functional complex capable of binding and/or cleaving a chromosomal DNA target site"); Appx2696–2697 ("Modified guide polynucleotides described above may also be delivered simultaneously in multiplex to target multiple chromosomal DNA sequences for cleavage or nicking.").

As another example, the Board cited page 109, which states that the modified guide RNA sequences in Table 8 are specifically designed to target the LIGCas-3 site in Maize. *See* Appx22–24. The Board also summarized expert testimony and technical literature rebutting Agilent's assertion that a skilled artisan would "doubt" Pioneer Hi-Bred's disclosure to this effect. Agilent's own expert understood that Pioneer Hi-Bred was teaching that its guide RNAs should be used to "edit genes," which means

"cleavage or nicking." *See* Appx1095; Appx4798–4799 at 109:20–110:14; Appx1422.

Throughout its brief, Agilent caricatures the Board as having based its decision regarding gRNA functionality solely on Pioneer Hi-Bred's definition of "guide polynucleotide," claiming that the Board went rogue and "relied on its own theory" to this effect. Opening Br. 22, 24. As shown above, that is not remotely the case. Indeed, the very first thing the Board cited in support of its findings on "gRNA functionality" was the entire section of Synthego's Petition regarding "gRNA functionality" and the supporting expert testimony. *See* Appx18 (citing Appx488–490 and Appx2458–2462 ¶¶ 138-41). Notably, Agilent does not dispute the Board's interpretation of the several relevant passages the Board relied upon.

Instead, Agilent argues that Pioneer Hi-Bred cannot have disclosed functional gRNAs because test data included in Pioneer Hi-Bred suggests that **some** of the gRNAs disclosed could not reliably cleave the target sequences. *See* Opening Br. 31 ("Example 5 does not demonstrate that the modified guides of Table 8 work as Pioneer Hi-Bred intended, but rather indicates that testing is needed to determine which if any of the modified guides **might** possibly work."); *id.* at 32 ("These disclosures show that it

was ***not known*** whether the guides in Table 8 would allow the CAS:guide complex to recognize, (or cleave or edit), the target DNA.")

As documented below, however, this misapprehends both the law governing anticipation and the relevance of Pioneer Hi-Bred's testing data.

### 1. Agilent's Arguments Are Immaterial To Express Disclosure

If the relevant element is "expressly described" in the prior art reference, then it is disclosed for the purposes of anticipation. *Kalman v. Kimberly-Clark Corp.*, 713 F.2d 760, 771 (Fed. Cir. 1983). As this Court has explained, the "word 'should'…constitutes a disclosure even if it is only precatory and does not necessarily convey the meaning of 'did.'" *Antor*, 689 F.3d at 1290.

It might matter for the ***enablement*** analysis whether the descriptions or examples provided in the prior art are sufficiently useful for a skilled artisan. Yet, that question has little to do with express disclosure, which is a matter of comparing the information in the prior art with the claim element at issue.

Furthermore, even for enablement, it is well settled that "a patent does not need to guarantee that the invention works" and "efficacy data

are generally not required." *Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1310 (Fed. Cir. 2015); *see also Rasmusson v. SmithKline Beecham Corp.*, 413 F.3d 1318, 1326 (Fed. Cir. 2005) ("[P]roof of efficacy is not required in order for a reference to be enabled for purposes of anticipation.").

Despite Agilent's contentions to the contrary, *see* Opening Br. 39, this legal principle is equally applicable to inventions with functional limitations. In *Alcon Research Ltd. v. Barr Laboratories, Inc.*, 745 F.3d 1180 (Fed. Cir. 2014), the claims required a "chemically-stabilizing amount of a polyethoxylated castor oil." *Id.* at 1184. This Court explained that, absent a showing "that any claimed embodiments would be inoperable," it was immaterial whether the patents "contain[ed] data proving that [the embodiments] enhance the chemical stability." *Id.* at 1190.

Even though the *Alcon* claims included the functional requirement of a "chemically-stabilizing amount" of castor oil, this Court did not require any "data" showing that the embodiments in the prior art in fact "enhance[d] the chemical stability." Just the opposite, this Court explained that a "patent does not need to guarantee that the invention works for a claim to be enabled." *Id.* at 1189. As *Alcon* explains, what

matters for enablement was that the "patents disclose exemplary compositions within the scope of the claims, detail how those example compositions are prepared from commercially-available ingredients, and provide step-by-step procedures...." *Id.*

As documented above, that is exactly what Pioneer Hi-Bred discloses. There is no requirement that Pioneer Hi-Bred actually disclose test data showing the embodiments had gRNA functionality. During the IPR proceedings, Synthego cited *Alcon* because it establishes that Agilent's enablement theory for functional limitations is without merit. *See* Appx912–913. Agilent failed to address it before the Board, and again ducks it in its principal appeal brief.

### 2. The Board Correctly Rejected Agilent's Functionality Arguments On The Facts

Putting aside the legal defects in Agilent's theory, it remains the case—as the Board found—that Agilent failed to produce any evidence showing that the modified gRNAs in Pioneer Hi-Bred were inoperable. Of course, Agilent has claimed these modified gRNAs so it cannot credibly contend they are non-functional. *See* Appx925–926. Agilent does rely on testing data in Pioneer Hi-Bred to suggest non-functionality. *See* Opening Br. 30–32. But, as shown below, that data is irrelevant and does not speak

to gRNA functionality as defined in Agilent's patents—namely, whether an RNA can associate with a Cas protein and target a polynucleotide.

Most important, the cleavage data that Agilent emphasizes so heavily is immaterial because it is solely applicable to synthetic **DNA** sequences, not the modified **RNA** sequences that are actually claimed in Agilent's patent. *See id.* As the Board expressly recognized, Synthego never even attempted to rely upon the **DNA**-based embodiments in Pioneer Hi-Bred for its invalidity arguments because the claims at issue pertain solely to RNA:

> Pioneer Hi-Bred discloses both DNA and RNA-based embodiments. The Petition is premised on the latter. Even if we accept Patent Owner's argument that the DNA-based examples lack gRNA functionality, that fact does not suggest that a POSA would doubt that the RNA-based embodiments, e.g., crRNAs comprising sequences 64–69 in Table 8, lack such functionality.

Appx22. This analysis was correct.

Agilent's argument seems to be that, because Pioneer Hi-Bred includes testing data allegedly showing that certain DNA sequences are not functional, it means that the entire disclosure in Pioneer Hi-Bred—including with regard to standard RNA modifications—should be thrown

out as being non-functional and/or lacking enablement.[2]  Opening Br. 30.

No case, however, suggests that the entirety of a prior art reference should

be disregarded or deemed to flunk the enablement requirement merely

because *some* of its embodiments might not be optimal.

Ironically, some of the primary embodiments in Pioneer Hi-Bred

that Agilent repeatedly alleges are inoperable are based on sequences 68

and 69, and include a string of consecutive methyl modifications.  These

exact modifications are specifically claimed in Agilent's own '034 patent, a

fact that the Board noted as a "tension" in its institution decision.  *See*

Opening Br. 37–38; Appx9360 n.17.

But there is no tension.  Agilent's allegations of inoperability are

based solely on test data supposedly establishing that these and other

sequences could not *cleave* the target.  *See* Opening Br. 31 ("Out of the

crDNA test results disclosed in Tables 4 and 5, the 'optimal' condition

---

[2] Agilent also repeatedly alleges that Pioneer Hi-Bred "abandoned" its patent application, arguing that this somehow shows that the inventors of Pioneer Hi-Bred did not even believe their disclosure would work or that it was not enabled.  *See* Opening Br. 18–19, 25, 51–52.  This argument, however, is not just legally unsupported, but also factually incorrect.  Pioneer Hi-Bred has a pending U.S. Patent Application and has received multiple foreign patents based on the same disclosure.  *See* U.S. App. No. 17/677,494; CA2922090C; EP3036327B1.  This Court may take judicial notice of these facts.

resulted in only 40 (0.004%) target DNA copies that were mutated." (citing Appx2690–2693)); *id.* at 31–32 ("Example 5...discusses a protocol '[t]o examine the effect that the modified...components described in Table 8 have ***on the ability of their associated modified guide polynucleotide/Cas endonuclease complex to recognize*** and cleave ***the [target] site***." (quoting Appx2697–2698)).

This argument based on lack of cleavage, however, is logically flawed because cleavage is ***not*** required for "gRNA functionality." As the claim language itself makes clear, "gRNA functionality" need only comprise "associating with a Cas protein and targeting the gRNA:Cas protein complex to a target." Appx286 at 243:21–22; Appx439 at 257:42–43; *see also* Appx924–925. The term "gRNA functionality" is, in fact, defined precisely this way in the specification. *See* Appx167 at 6:36–59; *see also* Appx4726–4730 at 37:12–41:15. While Agilent complains that Synthego sought to have "gRNA functionality" construed to this effect for the first time on reply, *see* Opening Br. 22, 37, it was, in fact, ***Agilent*** that first sought to erroneously construe "gRNA functionality" as requiring cleavage activity, in contravention of the claims and specification. *See* Appx924–926. Synthego can hardly be blamed for correcting Agilent's error.

True, both association and targeting can serve as predicates for cleavage. But this does not mean the test data on cleavage nullifies the operability of earlier steps. We would not evaluate a novice runner's claim that he could run a 5K by asking him for his Boston Marathon time. And the Board made a factual finding, after considering testimony from both experts, that a lack of cleavage activity does not imply an inability to associate and target. *See* Appx25–26. Agilent never contests that factual finding, instead emphasizing only the absence of testing data showing lack of cleavage. *See* Opening Br. 28–32, 36–38. But as explained above, cleavage is not required for functionality, nor is such testing data required for anticipation or enablement. The Board was correct to reject Agilent's arguments on this basis. *See* Appx25-26.

## B. The Board Did Not Violate The APA

Agilent contends that, even if the Board correctly found that Pioneer Hi-Bred disclosed gRNA functionality for the modified sequences, it committed procedural error because Agilent did not have fair notice. *See* Opening Br. 32–34. This is incorrect.

In concluding that Pioneer Hi-Bred disclosed gRNA functionality for the modified sequences, the Board did not deviate from the "arguments

that were advanced" by Synthego, nor was Agilent deprived of "a chance to respond." *Apple Inc. v. Corephotonics, Ltd.*, 81 F.4th 1353, 1360 (Fed. Cir. 2023).

### 1. The Board's Decision Fairly Reflects The Parties' Framing Of The Issues

In its petition, Synthego argued that Pioneer Hi-Bred globally characterized the modified sequences as possessing gRNA functionality. Synthego began its discussion of gRNA functionality by explaining that "Pioneer Hi-Bred teaches that the gRNA-Cas9 endonuclease complex enables Cas9 to recognize and cleave a target polynucleotide such as DNA," citing, among other things, to Pioneer Hi-Bred's definition of the term "guide nucleotide." Appx489. As for the modified sequences, Synthego stated *inter alia*:

> Pioneer Hi-Bred explains that chemically modified gRNAs with sugar and/or phosphodiester linkage modifications within five nucleotides from the 3'-end and the 5'-end of the gRNA ha[ve] gRNA functionality to edit cells. For example, it discloses that the modified gRNAs of Table 8 and Table 7 can be used to edit cells such as maize cells. *See* EX1003 ¶ 141; EX1006 at 108:4–11, 109:7–15.

Appx490. The first cited passage from Exhibit 1006—i.e., Pioneer Hi-Bred—explains that the modified gRNAs may be used "in any organism subject to genome modification with the guide polynucleotide/Cas

endonuclease system" to modify the targeted genes. Appx2697. The second cited passage discusses how the modified gRNAs can be used to edit maize cells. *See* Appx2698.

Synthego thus explained that Pioneer Hi-Bred discloses gRNA functionality because Pioneer Hi-Bred characterized both the modified and unmodified sequences as having such functionality. The unmodified sequences have this functionality because of the way that Pioneer Hi-Bred by definition employs the term "guide polynucleotide," and the modified sequences have this functionality because of, among other things, repeated disclosures that they could be used to modify cells in the same ways as gRNA generally could.

The Board adopted this position when it instituted review and put Agilent on notice of these bases for invalidity. Indeed, the Board clearly stated its preliminary view that the modified sequences appeared to possess gRNA functionality. The Board explained that Pioneer Hi-Bred used the same language to describe the modified sequences as it used to describe the unmodified sequences, which in turn were defined to perform the claimed functions. The Board found there was "a sufficient connection between the modified crRNA molecules in Table 8 and the disclosure of

guide RNA functionality throughout Pioneer Hi-Bred." Appx698. The Board then cited the definition of "guide polynucleotide" and noted "the disclosure of guide RNA functionality throughout Pioneer Hi-Bred." Appx698. Agilent was on notice from the outset that the Board deemed Pioneer Hi-Bred's definition of "guide polynucleotide" as pertinent to the question of whether the disclosed gRNAs included gRNA functionality.

The institution decision further noted that "Pioneer Hi-Bred states that its 'modified guide polynucleotides' can be used with the various 'components needed to form a functional guide polynucleotide/Cas endonuclease complex' and 'to target multiple chromosomal DNA sequences for cleavage or nicking.'" Appx698 (quoting Appx2697–2698).

The Board thus endorsed Synthego's argument that Pioneer Hi-Bred describes modified gRNA as possessing gRNA functionality in the same way as unmodified sequences. But, contrary to Agilent's contention, this was not by any means the sole basis for the Board's finding.

In its Patent Owner's response, Agilent never contested that Pioneer Hi-Bred consistently describes the modified sequences as possessing gRNA functionality. *See, e.g.*, Appx788 ("Based on Pioneer Hi-Bred's declaration of functionality, the Board perhaps assumed these sequences

were functional."). Instead, Agilent argued this was immaterial because, as a factual matter, none of the examples in Pioneer Hi-Bred had been demonstrated to be functional via testing data. *See* Appx784 ("Despite Petitioner's characterizations of Examples 4 and 5, they do not reveal any actual testing."); Appx786 (There "are no test results for Example 5, and there is no evidence that the tests even occurred.").[3]

Accordingly, by the time the Board rendered its final written decision, there was no dispute that Pioneer Hi-Bred generally described the modified sequences as possessing gRNA functionality. The disputed question was what significance to accord to the testing data in Pioneer Hi-Bred and, similarly, whether the actual functionality of the individual examples in Pioneer Hi-Bred via testing data was somehow required.

The Board's decision was faithful to the arguments made by the parties. The decision begins at the outset with a single page setting forth the undisputed premise, advanced in Synthego's petition, that Pioneer Hi-

---

[3] In its opening brief, Agilent suggests it "responded to the Petition as framed" and focused entirely on Synthego's suggestion that Pioneer Hi-Bred teaches guides with "gRNA functionality to edit cells." Opening Br. 20 (citing Appx490). In fact, Agilent's response not once used the phrase "edit cells" and the relevant section of the response nowhere cited to Synthego's petition. Instead, the response was directed almost entirely to the Board's institution decision. *See* Appx779–789.

Bred refers to the modified sequences as having gRNA functionality as required by the claims. Appx18. Just as the Board's previous institution decision had done, the decision notes that these sequences are described as "modified guide polynucleotides"—although this was just one of multiple points of evidence the Board cited for its decision. Appx18.

In addition, the Board also repeated two quotations **nearly verbatim** from its institution decision—that the modified polynucleotides could work in tandem with other components of the "guide polynucleotide/Cas endonuclease system" and that the modified nucleotides could "target multiple chromosomal DNA sequences for cleavage or nicking." Appx18 (quoting Appx2697–2698). Agilent failed to make any arguments to challenge such Board findings.

Having established this preliminary issue, the Board then turned to the actual dispute between the parties, in an eight-page discussion titled "Whether Pioneer Hi-Bred discloses a functional gRNA." Appx19–27. As discussed above, the Board made factual findings and exhaustively rejected in this discussion the arguments made by Agilent pertaining to gRNA functionality.

### 2. Agilent Had Fair Notice Of The Board's Reasoning

APA issues have arisen where the "Board departed markedly from the evidence and theories presented by the petition or institution decision, creating unfair surprise." *Arthrex, Inc. v. Smith & Nephew, Inc.*, 935 F.3d 1319, 1328 (Fed. Cir. 2019). For instance, in one case "the Board mixed arguments raised in two different grounds of obviousness in the petition to craft its own new theory of unpatentability." *Id.* (citing *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1372–73, 1377 (Fed. Cir. 2016)). In another case, the Board "announc[ed] a claim construction that 'varied ***significantly***' from the uncontested construction announced in the institution decision." *Id.* (quoting *SAS Inst. v. ComplementSoft, LLC*, 825 F.3d 1341, 1351 (Fed. Cir. 2016)) (emphasis in *Arthrex*), *rev'd and remanded on other grounds sub nom. SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348 (2018)). And in the *NuVasive* decision Agilent cites, the Board relied as an "essential part of its obviousness findings" on a figure in the prior art that was never cited until the petitioner's reply brief. *In re NuVasive, Inc.*, 841 F.3d 966, 971 (Fed. Cir 2016).

Nothing remotely similar occurred here. Agilent never disputed the Board's fundamental conclusion—that Pioneer Hi-Bred describes

modified sequences as possessing gRNA functionality—so the precise citations and reasoning used to support this conclusion simply were not at issue.

Moreover, to the extent they were at issue, Agilent had notice, prior to the Board's decision, of the Board's framing of the issue. The language and citations employed in the Board's final written decision are largely the same as those in the Board's decision institution decision. As this Court has previously explained, there is no violation of the APA where the Board's final written decisions are based on the same theories "set forth in its institution decisions." *Genzyme Therapeutic Pros. Ltd. v. Biomarin Pharm. Inc.*, 825 F.3d 1360, 1366 (Fed. Cir. 2016).

The Board's final written decision tracked closely the reasoning of the institution decision. The decision also adopted the same overall theory as Synthego had presented in the petition—that Pioneer Hi-Bred characterized the modified sequences as possessing the same gRNA functionality as the unmodified sequences. "In these circumstances, the mere fact that the Board did not use the exact language of the petition in the final written decision does not mean it changed theories in a manner

inconsistent with the APA and [this Court's] case law." *Arthrex*, 935 F.3d at 1327.

## II. Pioneer Hi-Bred Is Enabling.

To anticipate later patent claims, a prior art reference must be enabling, which simply requires "that the reference teach a skilled artisan—at the time of filing—to make or carry out what it discloses in relation to the claimed invention without undue experimentation." *In re Morsa*, 803 F.3d 1374, 1377 (Fed. Cir. 2015). "[R]egardless of the forum, prior art patents and publications enjoy a presumption of enablement, and the patentee/applicant has the burden to prove nonenablement for such prior art." *Apple Inc. v. Corephotonics, Ltd.*, 861 F. App'x 443, 450 (Fed. Cir. 2021); *Cameron Int'l Corp. v. Nitro Fluids, L.L.C.*, No. 2021-1183, 2022 WL 636099 (Fed. Cir. 2022).

Agilent failed to overcome that presumption before the Board for two independent reasons: First, Pioneer Hi-Bred contains numerous specific embodiments of the modified gRNA sequences at issue here, and these embodiments could be easily made by a skilled artisan using known techniques. While Agilent argued that these embodiments were not actually functional, the Board found as a factual matter that there was no

evidence supporting Agilent's contention. This factual finding is entitled to deference, and Agilent does not present a serious basis to overturn it.

Second, even notwithstanding the specific embodiments in Pioneer Hi-Bred, the RNA modifications at issue were well-known in the field. As the Board found, a skilled artisan reading Pioneer Hi-Bred at the end of 2014 would have understood that the modifications at issue would likely preserve gRNA functionality and could easily be implemented. Indeed, Agilent's own experience shortly thereafter confirms that it was not difficult for a skilled artisan with knowledge of the prior art to create functional modified gRNAs.

Agilent does not explain why these factual findings should be reversed on the deferential substantial evidence standard. Instead, Agilent leans primarily on the number of combinations that could conceivably be created under Pioneer Hi-Bred's disclosures. That argument fails too.

## A. Pioneer Hi-Bred Is Enabling Because A Skilled Artisan Could Make The Functional gRNAs Disclosed In Pioneer Hi-Bred

The enablement inquiry here is straightforward. Pioneer Hi-Bred discloses specific embodiments of the modifications at issue through the

sequences disclosed in Examples 4 and 5.  As this Court has explained, a "reference need only enable a single embodiment of the claim."  *In re Morsa*, 803 F.3d at 1377.  The relevant question, then, is whether Pioneer Hi-Bred enabled these sequences, i.e., whether a skilled artisan could "make or carry out" the sequences without undue experimentation.  *Id.*

The answer is simple: as the Board found, and as Agilent does not dispute on appeal, the evidence showed that "standard techniques …were known in the art," such as "click chemistry" and "TC chemistry," and a skilled artisan thus could have made the disclosed modified gRNA without undue experimentation.  Appx29.  Agilent asserts in its brief that the relevant synthetic techniques "presented challenges."  Opening Br. 10.  But, as the Board noted, Agilent's own witness on this issue was not credible and could not even say how they supposedly overcame the alleged challenges.  *See* Appx30–31; Appx1129–1132.

Agilent's argument rests on the supposition that the gRNA sequences were not proven to be ***actually*** functional.  But as explained above, enablement does not require test data or other proof of efficacy of the embodiments at issue.  Absent affirmative evidence that the embodiments are inoperative, it is enough to show that they were

expressly disclosed.  Further, as set forth in this Court's decisions, Agilent had the burden to show the disclosures were not enabling.  But, as the Board repeatedly found, Agilent's arguments failed on the facts.  *See* Appx24–25.

The Board supported its findings with substantial record evidence. For instance, the Board noted there was "test data in the record demonstrating gRNA functionality" for modified gRNAs resembling those in Pioneer Hi-Bred's sequences.  Appx24–25.  And while Agilent relied heavily on data indicating that cleavage often did not occur with certain of Pioneer Hi-Bred's sequences, the Board evaluated the expert testimony of both parties, credited Synthego's expert, and ultimately concluded that an inability to cleave does not imply that the gRNA sequence cannot associate with a Cas protein and target an identified DNA sequence.  *See* Appx25–26.

Moreover, as noted above, the test data in Pioneer Hi-Bred relied on by Agilent concerns entirely ***DNA*** sequences, not the ***RNA*** sequences at issue here.  This made sense in the context of Pioneer Hi-Bred, which—as Agilent itself notes, *see* Opening Br. 14, taught as one of its embodiments that synthetic DNA sequences could be used instead of synthetic RNA

sequences for the guide sequences employed in the CRISPR-Cas system. As the Board noted, this does not diminish Pioneer Hi-Bred's other teachings regarding synthetic RNA sequences, which had been well understood for their use in the CRISPR-Cas system. *See* Appx2691 ("[R]ibonucleic acids or RNA have been the only molecules described to guide a Cas9 endonuclease to recognize and cleave a specific DNA target site. In this example, we provide evidence that a new class of molecules, deoxyribonucleic acids (DNA), can also be used to guide a Cas endonuclease to recognize and cleave chromosomal DNA target sites."); Appx22.

Agilent quibbles with the Board's factual findings, but does not show that these findings are unsupported by substantial evidence, particularly given that it was Agilent that had the burden to show non-enablement. (And in any event, as explained above, the evidence was more than sufficient to show Synthego met any burden to prove enablement.) Primarily, Agilent suggests that there is little ***affirmative*** testing data suggesting that the disclosed sequences possess the described gRNA functionality. But the law does not require such data.

## B.    A Skilled Artisan Would Not Need Undue Experimentation To Screen For Functionality

On appeal, Agilent argues that, in light of the state of the art in 2014, a skilled artisan would lack guidance as to whether an individual modified sequence likely would function as a gRNA.  Agilent argues that Pioneer Hi-Bred teaches a range of modifications that "exceeds the number of stars in the sky" or more than $6^{39}$ possible combinations.  Opening Br. 18, 48. Agilent likewise asserts that "undue experimentation would be required to produce and screen innumerable candidates for the claimed functionality," particularly "given the nascent and highly uncertain state of the art as of December 2014."  *Id.* at 42–43.

Such arguments are unavailing because, as explained above, the embodiments in Pioneer Hi-Bred were described as functional and because Agilent has not met its presumption to show a lack of functionality.  And, even if Agilent were correct that certain embodiments might not be functional, Agilent did not show that screening for functionality would require undue experimentation.  In fact, substantial evidence confirms that the experiments would have been routine and that Pioneer Hi-Bred, rather than including a scattershot invitation to experiment bereft of guidance or logic, includes a focused and reasoned

description that a skilled artisan would readily follow to achieve the alleged inventions.

### 1. As The Board Explained, It Would Not Have Been Difficult To Screen For Functionality

Under this Court's precedents, undue experimentation is a holistic inquiry that requires considering such factors as: "(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims." *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).

The Board recognized these factors controlled, *see* Appx29 n.13, and rejected Agilent's argument "that the nascent state of the art demonstrates that undue experimentation would be required," *see* Appx32. This factual finding is supported by substantial evidence.

As the Board noted, while the CRISPR-Cas system was relatively new, "by December 2014 substantial research into such systems had been published and would have been known to a POSA." Appx32. Furthermore, "the particular types of modifications disclosed in Pioneer Hi-Bred and recited in the challenged claims had been known and used

for decades to stabilize RNA against unwanted degradation in other systems." Appx32. Agilent's expert's admissions to this effect were extensive. *See* Appx1139–1150. Accordingly, a skilled artisan would have understood "the types of chemical modifications that had been successfully used in other systems to reduce RNA degradation, *while preserving functionality*." Appx32.

To support this factual finding, the Board cited extensive evidence establishing that a skilled artisan would be highly familiar with the modifications at issue and could devise functional modified gRNAs without undue experimentation. For instance, the Board cited to declarations from Synthego's expert explaining that "a person of ordinary skill in 2014 would…have…understood that chemical modifications at the 5' and/or 3' ends of guide RNAs in CRISPR-Cas applications would have preserved the Cas enzyme's gene editing function," Appx2423, and that a skilled artisan "would have been able to read" studies concerning the Cas9 enzyme "and form reasonable hypothes[e]s about which modifications would be tolerated," Appx4514. Likewise, the Board cited to record evidence explaining that the specific modifications disclosed in Pioneer Hi-

Bred and in Agilent's patents were well understood by 2014, and had in fact been employed in a variety of synthetic RNAs.  *See* Appx2413–2416.

Indeed, the specifications in Agilent's ***own patents*** confirm that identifying a functional gRNA in this field was not difficult.  As Table 4 of the '001 patent shows, Agilent tested roughly 250 gRNAs, all but of seven of which worked for their intended purpose, a ***97%*** success rate.  *See* Appx223–225; Appx920–921; *see also* Appx28 (reference to this point in the Board's final written decision).  Agilent's expert had no explanation how this was possible.  *See* Appx4792 at 103:11–17 ("I can't speculate on that.").  Of course, the explanation is that the field was predictable.[4]

---

[4] Agilent suggests, albeit only in passing and in a footnote, that Pioneer Hi-Bred taught only "truncated" 17-nucleotide domains that "could" be more likely to suffer from functionality problems.  Opening Br. 17 n.2, 55–57.  This is without merit.  As with Agilent's other arguments, the Board rejected these arguments as a factual matter based on extensive evidence.  *See* Appx22–25.  As the Board explained, the gRNAs in Pioneer Hi-Bred were not "truncated," but were designed with a specific length to target a specific sequence in maize.  *See* Appx4537 ¶¶ 73–74.  Moreover, Agilent's own expert confirmed that 17 nucleotide sequences would work with CRISPR, a point that was repeatedly confirmed in contemporaneous literature.  *See* Appx1107–1110; Appx8230 ¶ 202; Appx8834; Appx8722; Appx8736.  Further, Agilent's own patents broadly contemplate that the guide RNAs can be from 15–30 nucleotides long, and specifically teaches 17 nucleotide long guide RNAs.  *See* Appx187 at 45:1–4; Appx229 at 129:35–37; Appx202 (listing four "17mer" sequences).

In light of the record evidence showing that a skilled artisan would have little difficulty screening for functionality and the disclosures from Agilent's own patents supporting this conclusion, the Board's finding is supported by substantial evidence.

### 2. Agilent Does Not Provide Any Factual Reason Why Screening For Functionality Would Require Undue Experimentation

As this Court has recognized, "[w]hether undue experimentation is needed is not a single, simple factual determination, but rather is a conclusion reached by weighing many factual considerations." *Wands*, 858 F.2d at 737. A "considerable amount of experimentation is permissible, if it is merely routine, or if the specification in question provides a reasonable amount of guidance with respect to the direction in which the experimentation should proceed." *Id.* (internal quotation marks omitted). The guiding question is simply whether the experimentation is reasonable. *Id.* Agilent had the burden to show that it was not.

Agilent cannot meet that burden because Agilent does not make on appeal any factual argument that a skilled artisan attempting to devise functional modified gRNAs from Pioneer Hi-Bred would have been unable to achieve success absent undue experimentation. For instance, Agilent

does not offer evidence as to what fraction of the specific embodiments in Pioneer Hi-Bred were likely to prove non-functional. Agilent's own brief concedes that many of Agilent's **own sequences** follow the embodiments disclosed by Pioneer Hi-Bred. *See* Opening Br. 50 ("Agilent's testing later showed that guides with some of the modifications that Pioneer Hi-Bred[] proposes turn out to have guide RNA functionality."). And, as discussed above, Agilent was able to achieve a 97% success rate with its own gRNA modifications.

Instead, Agilent focuses primarily on the number of combinations theoretically disclosed by Pioneer Hi-Bred. But the relevant question is not the number of possible combinations, but whether it would require undue experimentation for a skilled artisan to select a functional modification from that set. And that question demands considering guidance from the prior art as to which combinations would likely be functional. A skilled artisan, after all, would not choose a combination at random. And while the *Wands* factors recognize breadth of the prior art as a factor, it is only one of eight.

In this context, an artisan would be guided by the specific embodiments expressly disclosed in Pioneer Hi-Bred, by the extensive

literature on RNA modifications, and by the well-known fact that modifications are most effective if introduced near the 3' or 5'-end of the sequence. And they would be guided as well by Table 8 of Pioneer Hi-Bred, which presents exemplary embodiments that show precisely which modifications at which positions were likely to be successful—including the types and locations of modifications that anticipate Agilent's patent claims:

Table 8. crRNA and crDNA nucleotide base and phosphodiester linkage modifications.

| Nucleic Acid Type | Modification | crRNA or crDNA Sequence and Corresponding Modification[1] | |
|---|---|---|---|
| | | VT Domain | CER Domain |
| crRNA | None | GCGUACGCGUACGUGUG (SEQ ID NO: 62) | GUUUUAGAGCUAUGCUGUUUUG (SEQ ID NO: 63) |
| crRNA | Phosphorothioate bonds near ends | G*C*G*UACGCGUACGUGUG (SEQ ID NO: 64) | GUUUUAGAGCUAUGCUGUU*U*U*G (SEQ ID NO: 65) |
| crRNA | 2'-O-Methyl RNA nucleotides at ends | mGmCmGUACGCGUACGUGUG (SEQ ID NO: 66) | GUUUUAGAGCUAUGCUGUUmUmUmG (SEQ ID NO: 67) |
| crRNA | 2'-O-Methyl RNA nucleotides for each nucleotide | mGmCmGmUmAmCmGmCmG mUmAmCmGmUmGmUmG (SEQ ID NO: 68) | mGmUmUmUmUmAmGmAmGmC mUmAmUmGmCmUmGmUmUmUmU mUmG (SEQ ID NO: 69) |

Appx2698.

### 3. Agilent's Reliance On *Impax* And *Amgen* Is Misplaced

In arguing that this Court must overturn the Board because of the theoretical scope of Pioneer Hi-Bred's disclosures, Agilent relies primarily

on this Court's decision in *Impax Laboratories v. Aventis Pharmaceuticals, Inc.*, 545 F.3d 1312 (Fed. Cir. 2008), and the Supreme Court's recent decision in *Amgen Inc. v. Sanofi*, 598 U.S. 594 (2023). This argument is mistaken.

**1.**    Not only does *Impax* not support Agilent's argument here, *Impax* in fact demonstrates why Pioneer Hi-Bred is sufficiently enabling to anticipate Agilent's patents. In *Impax*, the challenged patent disclosed the use of riluzole to treat amyotrophic lateral sclerosis. The prior art reference disclosed thousands of compounds in its formula I, including riluzole, and referenced several diseases. 545 F.3d at 1315. The court found this prior art reference was not enabled as to the use of riluzole to treat ALS for two reasons. First, "nothing in the…patent would direct one skilled in the art to recognize that riluzole could be used to treat ALS." *Id.* In other words, a skilled artisan would have no reason to know from the patent why riluzole would be useful for ALS—as opposed to the other diseases referenced in the patent.

Whereas *Impax* taught "hundreds or thousands" of compounds, Table 7 of Pioneer Hi-Bred discloses only five types of modifications and explains precisely why those modifications should be used:

Table 7. Nucleotide base and phosphodiester bond modifications to decrease unwanted nuclease degradation.

| Modification | Effect |
|---|---|
| Deoxyribonucleic Acid | Less susceptible to nuclease degradation than RNA[1] |
| Locked Nucleic Acid | Very resistant to nuclease cleavage[2] |
| 2'-Fluoro A or U | Increased resistance to nuclease cleavage[3] |
| 2'-O-Methyl RNA Bases | Resistant to ribonucleases and 5-10 fold more resistant to DNases than DNA[4] |
| Phosphorothioate bond | Very resistant to nuclease cleavage[5] |

Appx2696. In Table 8, Pioneer Hi-Bred goes further and presents exemplary embodiments of gRNAs containing those modifications and the precise positions where those modifications ought to be placed, including the types and locations of modifications that anticipate. Appx2698–2699. What's more, Pioneer Hi-Bred discloses that modified gRNAs of Tables 7 and 8 can be used to edit cells such as maize cells and includes an experimental procedure. *See* Appx2458–2460 ¶ 138; Appx2697–2698 at 108:4–11, 109:7–15. As the Board noted, the disclosed modifications "had been known and used for decades to stabilize RNA against unwanted degradation in other systems." Appx32.

Second, the prior art in *Impax* contained no specific information as to the dosage required for riluzole to work as a treatment for ALS. *See* 545 F.3d at 1315 ("the '940 patent's dosage guidelines are broad and general

without sufficient direction or guidance to prescribe a treatment regimen").  Accordingly, an inventor would be left entirely in the dark as to **how** riluzole could be employed to treat ALS—even if the inventor were able to discern that this would be a useful function.  Here, by contrast, as the Board found, a skilled artisan would understand how to synthesize the modified gRNA using well known techniques.

In short, Pioneer Hi-Bred does not aimlessly teach $6^{39}$ or a "quadrillion quadrillion" molecules, but rather includes a targeted and reasoned disclosure that points to a focused range of specific embodiments based on particularized rationale.  This case is nothing like *Impax*.

**2.**   As for *Amgen*, Agilent misconstrues the context, and thus the relevant language, in that decision.  *Amgen* was not an anticipation case; instead, the question was whether a patent was sufficiently enabling to be valid under section 112 of the Patent Act.  *See Amgen*, 598 U.S. at 599; 35 U.S.C. § 112(a).

In the invalidity context, "the specification must enable **the full scope of the invention** as defined by its claims." *Amgen*, 598 U.S. at 610.  In other words, "the claims measure the invention." *Id.* (quoting *Continental Paper Bag Co. v. Eastern Paper Bag Co.*, 210 U.S. 405, 419

(1908)); *see also id.* at 613 ("[I]f our cases teach anything, it is that the more a party claims, the broader the monopoly it demands, the more it must enable."). Accordingly, the relevant question in *Amgen* was whether the claim at issue, considered in its entirety, was enabled by the specification. Thus, the Court was particularly attuned to the number of potential antibodies encompassed by the patent claims. *See id.* at 612–13 (noting that the claims "sweep much broader" than the 26 exemplary antibodies disclosed in the patent).

But this question—comparing the theoretical scope of a claim against the specification—is simply not at issue in the anticipation context here. Rather, as this Court has explained, "a prior art reference need not enable its full disclosure; it only needs to enable the portions of its disclosure alleged to anticipate the claimed invention." *Antor*, 689 F.3d at 1290.

After all, the nature of the two inquiries is very different. In the invalidity context, enablement ensures the patent applicant does not seek a broader monopoly than the specification actually teaches. The purpose of the enablement inquiry in the anticipation context, by contrast, is to ensure that the prior art actually would have taught a skilled artisan to

devise an **embodiment** of the invention at issue. It follows that the language in *Amgen* emphasizing the breadth of the patent claims in that case, and the number of potential examples, does not bear on the question here, which is whether the anticipating disclosures were specifically enabling.

But even taken at face value, *Amgen* does not suggest that Pioneer Hi-Bred is not enabling. In *Amgen*, the patent claims encompassed literally millions of antibodies, without identifying those antibodies or providing a reasonably reliable method short of trial-and-error by which they could be generated. 598 U.S. at 613–14. Adopting an analogy presented by amici, the Court analogized the patent claims to an invention that purported to disclose all the successful combinations to a massive combination lock—while simply instructing readers to use trial and error to see which combinations work. *Id.* at 614.

This bears little resemblance to Pioneer Hi-Bred, which specifically identified nucleotide modifications that were well known in the field, that were unlikely to compromise gRNA functionality, and that were indeed later adopted by Agilent with little difficulty. As the Board found, in light of the guidance in Pioneer Hi-Bred and the state of the art at the time, a

skilled artisan would have understood how the CRISPR/Cas system functioned, what chemical modifications had been used in other synthetic RNAs to reduce degradation while retaining functionality, and how to synthesize the modified solutions. *See* Appx32. In light of all this, the disclosures in Pioneer Hi-Bred look less like the infinite library of combination lock solutions at issue in *Amgen* and more like a locksmith's manual.

## C. Agilent's Argument On sgRNAs Is Both Immaterial And Wrong

Agilent suggests that even if Pioneer Hi-Bred is generally enabling, it does not enable functional sgRNA "because this feature is not disclosed in the examples of Table 8." Opening Br. 59. As explained below, this argument is incorrect.

But even if it were correct, it could not justify vacating or remanding the Board's decision because Agilent has not appealed the Board's alternative holding on Ground 4, which found the sgRNA limitation unpatentable on obviousness grounds. In that portion of the Board's decision the Board held that, ***even if not anticipated by Pioneer Hi-Bred***, the sgRNA limitation was obvious over Pioneer Hi-Bred in combination with the knowledge of a skilled artisan. *See* Appx61–63;

Appx136–137.  Ground 4 does not require Pioneer Hi-Bred to anticipate sgRNA and hence does not require Pioneer Hi-Bred to enable functional modified sgRNA.  Agilent has forfeited any challenge to Ground 4 by failing to appeal that portion of the Board's decision.

In any event, Agilent's argument fails.  First, Agilent never presented this enablement argument to the Board in its response.  None of the enablement arguments in Agilent's response brief so much as reference sgRNA, *see* Appx790–794, and the concept is absent from the sole page cited by Agilent on appeal.  *See* Opening Br. 59 (citing Appx785).

While Agilent did make a similar argument in its discussion of anticipation more generally, *see* Appx778–779, the Board explained why this argument was without merit.  Pioneer Hi-Bred expressly disclosed that "its guide polynucleotides can be implemented as 'a single molecule or a double molecule.'"  Appx34 (quoting Appx2613).  Moreover, "Pioneer Hi-Bred specifically states that the modifications in Table 8 can also be introduced in a 'long guide RNA,' i.e., a sgRNA."  Appx34 (citing Appx2702).  And figures in Pioneer Hi-Bred show the sgRNA performing exactly the same functionality as the duplex gRNA:



Appx2725. Hence, there was no basis for concluding that Pioneer Hi-Bred did not anticipate sgRNA with the disclosed modifications.

Even if Agilent's enablement argument were not forfeited, it would fail for the same reason. Pioneer Hi-Bred: (1) provides examples of modifications that may be introduced into an sgRNA; and (2) explains that these modifications may be introduced into an sgRNA. Hence, all the above arguments why the functional gRNAs are enabled hold true for the sgRNA claims as well: Pioneer Hi-Bred disclosed specific embodiments, explained that these embodiments could be applied to sgRNA, and a skilled artisan could have used standard methods to synthesize the sgRNA. Indeed, Agilent's own patents explained that sgRNA could be

synthesized using methods standard in the prior art. *See* Appx188 at 47:57–64 ("Synthesis of guide RNAs can also be accomplished by … "click" chemistry as published by R. Kumar … or squarate conjugation chemistry as described by K. Hill."). Furthermore, to the extent any modifications might be non-functional, screening for functionality in sgRNA would not require undue experimentation—for exactly the same reasons as are true for gRNA writ large.

Indeed, Agilent only provides one basis for distinguishing sgRNA from gRNA—that they are supposedly more challenging to synthesize than dual guides. *See* Opening Br. 59–60. But the Board expressly found that synthesis would not be particularly difficult for long guide RNAs, i.e., sgRNA. As the Board explained, Agilent's patents did not disclose any novel methods for synthesizing modified gRNAs, and Agilent's expert couldn't credibly explain any innovative synthesis methods used by Agilent. Appx30–31. Agilent does not provide any reason on appeal why these arguments aren't supported by substantial evidence.

## III. The PACE And thioPACE Modifications Are Obvious

As the Board found, a skilled artisan would have been motivated to combine Pioneer Hi-Bred with Threlfall or Deleavey, which together

disclose functional modified gRNA with PACE or thioPACE modifications, and that such an artisan would have reasonably expected this combination to be successful.  On appeal, Agilent provides no sound basis to disturb these findings.

## A.    A Skilled Artisan Would Understand That PACE And thioPACE Modifications Preserve gRNA Functionality

Agilent first argues that the Board's obviousness determination should be reversed because Pioneer Hi-Bred does not expressly disclose functional PACE or thioPACE modified guides.  *See* Opening Br. 39–41. This argument is both forfeited and wrong.

To begin, the only relevant language in Agilent's response brief—as Agilent cites on appeal, *see* Opening Br. 40—reads in its entirety as follows:

> All of Petitioner's obviousness grounds fail because they do not do nothing [*sic*] to cure Pioneer Hi-Bred's lack of disclosure of Element 1E, 12E, and 21D–E.  Hence, if the Board determines that 1E, 12E, and 21D are not disclosed in Pioneer Hi-Bred, then Petitioner's obviousness grounds fail as well.

Appx798–799. Elements 1E, 12E, and 21D–E refer simply to the requirement of gRNA functionality in the independent claims of the '001 patent.[5] *See* Appx450; Appx453–455.

In other words, Agilent's argument before the Board was solely contingent on Agilent's disclosure arguments addressed above and had nothing to do with PACE or thioPACE modifications specifically. And while Agilent did speak to PACE and thioPACE modifications more directly in its sur-reply brief, *see* Appx998, the argument had at that point been forfeited. *See Laitram, LLC v. Ashworth Bros., Inc.*, 2023 WL 3449148, at *5 (Fed. Cir. May 15, 2023) ("Laitram did not make this argument until its sur-reply, and so it is forfeited.").

Furthermore, Agilent's argument misapplies obviousness law. As explained above, Pioneer Hi-Bred disclosed functional gRNA with modifications to a phosphodiester linkage or a sugar—the relevant language in Claim 1 of both the '001 and the '034 patents. And as Agilent does not dispute, both Threlfall and Deleavey disclose PACE and thioPACE modifications to synthetic RNA. Accordingly, in combination

---

[5] Agilent presented the identical argument with respect to the obviousness issue in the '034 patent. *See* Appx9458. The analysis is precisely the same for both patents.

the references disclose all the elements of the relevant claims: (1) functional gRNA with modifications to a phosphodiester linkage or a sugar (Pioneer Hi-Bred), (2) where such modifications are PACE or thioPACE modifications (Threlfall or Deleavey).

In disputing this point, Agilent suggests that because the patent claims contain a functional limitation, the combination disclosed above is insufficient. Rather, according to Agilent's belated argument, one of the prior art references must disclose a functional gRNA with a PACE or thioPACE modification. But obviousness asks solely whether, for a skilled artisan, "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made." 35 U.S.C. § 103(a).

Accordingly, the question was simply whether the **combination** of Pioneer Hi-Bred with Threlfall or Deleavey, as implemented by a skilled artisan, would encompass all the claims of the patent. *See, e.g.*, *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 416 (2007) ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results."). As applied here, this simply means combining the teaching of Threlfall or Deleavey (that synthetic

RNA may be modified with PACE or thioPACE modifications to avoid nuclease degradation) with Pioneer Hi-Bred (that modifications to the sugar or phosphodiester linkage in gRNAs preserve the functionality of the gRNAs while avoiding nuclease degradation). This combination encompassed the relevant patent claims.

The obviousness requirement does not require that any given prior art reference show functionality for all the disclosed claims. If it did, then just by adding a functionality limitation, any inventor could render their patent immune from all obviousness challenges that rely on more than a single reference.

## B.    Substantial Evidence Shows That A Skilled Artisan Would Have Reasonably Expected The PACE And thioPACE Modifications To Be Successful

As the Board explained, a skilled artisan would have little doubt that well known modifications to synthetic RNA, such as PACE and thioPACE, could be readily synthesized and applied to the gRNA without compromising functionality. The Board credited the testimony of Synthego's expert, Dr. Furneaux, in this respect, and it cross-referenced its earlier discussion on "Ground 2," i.e., Synthego's argument that a

distinct type of modification (2'-O-methyl-3' phosphorothioate modifications) was obvious in light of the prior art. *See* Appx60.

Agilent suggests the Board's Ground 2 discussion does not bear on the PACE and thioPACE modifications at issue in Ground 3, i.e., the obviousness challenge it appeals here. But this is mistaken. The Board expressly made clear that its Ground 2 analysis was not limited to Ground 2 but instead responded to "the global arguments Patent Owner collectively argues for all of the obviousness grounds" and hence "considers the claims in all of those grounds." Appx44 n.16. Agilent after, all, had challenged all the obviousness determinations on the same grounds in its response brief. *See* Appx799. And Agilent's arguments were focused generally on the purported unpredictability of making modifications—not on the specific modifications at issue. *See* Appx805 ("A POSA would have known that modifying certain portions of the gRNA, and in particular, the guide portion, could directly impact the claimed functionality."); Appx808–809 (A "POSA would have known that testing was essential to determine which modifications could achieve the desired effects without impacting functionality.").

The Board's discussion thus reflected Agilent's briefing and considered the obviousness arguments together. And in doing so, the Board repeatedly explained why the evidence showed a skilled artisan would have reasonably expected the PACE and thioPACE modifications to be successful.

First, the Board explained that success was likely because Dr. Furneaux had testified that a skilled artisan "would have expected that chemical modifications could be made at the 5' and 3'-ends of a gRNA while preserving the Cas enzyme's gene editing function." Appx48–49. The Board found this evidence was supported by "several studies" that had been published by December 2014 "show[ing] that the CRISPR/Cas system could successfully tolerate modifications." Appx48.

The cited passages of Dr. Furneaux's testimony spoke specifically to the PACE and thioPACE modifications at issue in Ground 3. As Dr. Furneaux explained in the cited passage, RNAs with such modifications had previously been synthesized in Threlfall, so a skilled artisan would not expect challenges in synthesizing them. Appx2535–2536. And "[b]ecause of the previous widespread use of PACE and thioPACE modifications at or near the 3' and/or 5' ends in various types of RNA

molecules," a skilled artisan "would have reasonably expected that the same or similar PACE and thioPACE…modifications…would have resulted in modified guide RNAs that would be functional with the CRISPR-Cas system." Appx2535–2536.

Next, the Board explained that a skilled artisan would have understood that prior art RNA systems "share features in common with CRISPR/Cas, including that their efficiency and functionality is limited by the fact that the RNA used in them is subject to unwanted degradation." Appx51. Again, the Board cited to testimony by Dr. Furneaux directly addressing the PACE and thioPACE modifications, and explaining that "[a] person of ordinary skill in the art would have been motivated to use the PACE and thioPACE modifications…because they would provide the same benefits to guide RNAs that Pioneer Hi-Bred seeks to achieve." Appx2533 (cited in Appx51).

Then, for a third time, the Board cited Dr. Furneaux's testimony on the PACE and thioPACE modifications, this time explicitly: "To the extent Dr. Marshall testifies that the successful use of these modifications in prior art systems does not evidence at least a reasonable expectation they could also be successfully used in a CRISPR/Cas system …, we credit

Dr. Furneaux's testimony (Ex. 1003 ¶¶ 62–79, 256–70 (Ground 2), 287–88 (Ground 3)." Appx51. Exhibit 1003 refers to Dr. Furneaux's Testimony. By expressly citing both Ground 2 and Ground 3, the Board could not have been more clear that it was resolving all of Agilent's expectation-of-success claims in the same section—not that it was focused solely on the modifications at issue in Ground 2.

In sum, the Board found a reasonable likelihood of success for the PACE and thioPACE modifications because of record evidence establishing: (1) the modifications could be easily synthesized; (2) the modifications would likely preserve gRNA functionality; and (3) the CRISPR-Cas system was not so unpredictable as to discourage artisans from employing these modifications. Agilent may disagree with these factual determinations, but it has provided no sound reason to overturn them on the deferential standard of review.

## CONCLUSION

This Court should affirm the Board in all respects.

Respectfully submitted,

Dated: February 16, 2024

/s/ Edward R. Reines
Edward R. Reines
Derek C. Walter
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000
edward.reines@weil.com

*Counsel for Appellee*

# CERTIFICATE OF COMPLIANCE

The undersigned counsel of record certifies pursuant to Federal Rule of Appellate Procedure 32(g) and Federal Circuit Rule 32(b)(3) that the Brief complies with the type-volume limitation of Federal Circuit Rule 32(b)(1) because, excluding the parts of the Brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2), this document contains 13,984 words.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Century Schoolbook font in 14 point size.

Dated: February 16, 2024

*/s/ Edward R. Reines*

Edward R. Reines
*Principal Attorney*
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000
edward.reines@weil.com

*Counsel for Appellee*